UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

                                Plaintiff,

-against-

CPT MEDICAL SERVICES, P.C.,                          04-CV-_____
HOSS MEDICAL, SERVICES, P.C.,
HUSEYIN TUNCEL, M.D.,                                        COMPLAINT
BOZENA AUGUSTYNIAK, M.D.,
MICHAEL AZIZ, M.D.,
ANNE BRUTUS, M.D.,
IRINA KIMYAGAROVA, M.D.,
VICTOR MARIANI, M.D.,
AHMAD RIAZ, M.D.,
MARK SLAMOWITZ, D.C.,
SAKO TARAKHCHYAN, D.C.,

                                Defendants.
-------------------------------------------------------------x

        State Farm Mutual Automobile Insurance Company ("State Farm"), for its complaint

against defendants, alleges as follows:

**I.      NATURE OF THE ACTION**

        1.      This action seeks to recover millions of dollars that defendants have obtained

from State Farm by submitting, and causing to be submitted, thousands of fraudulent charges for

medically unnecessary current perception threshold tests ("CPT Tests") which were purportedly

rendered for diagnostic purposes to individuals ("Insureds") who have been injured in

automobile accidents and are eligible for insurance coverage under State Farm's insurance

policies.  In addition, State Farm seeks a declaratory judgment that the defendants CPT Medical

Services, P.C. and Hoss Medical Services, P.C. have no right to receive payment for any pending

bills for the CPT Tests.

2.     The defendants fall into three categories:

(a)     Defendants Bozena Augustyniak, Michael Aziz, Anne Brutus, Irina Kimyagarova, Victor Mariani, Ahmad Riaz, Mark Slamowitz and Sako Tarakhchyan are doctors who treat Insureds at clinics in New York City for soft tissue injuries and order the CPT Tests, knowing that the tests are medically unnecessary. (These defendants hereafter are collectively referenced as "the Prescribing Doctors").

(b)     Defendant Huseyin Tuncel is a medical doctor who purportedly renders the CPT Tests to Insureds and interprets the results for the Prescribing Doctors, knowing that the tests are medically unnecessary. (Huseyin Tuncel hereafter is referenced as "Dr. Tuncel").

(c)     Defendants CPT Medical Services, P.C. and Hoss Medical Services, P.C. are professional medical corporations owned and controlled by Dr. Tuncel, and through which he renders, interprets and charges for the CPT Tests. (CPT Medical Services, P.C. and Hoss Medical Services, P.C. hereafter are referenced collectively as "the PC Defendants").

3.     As discussed below, defendants at all times relevant have known that: (a) the CPT Tests were not medically necessary because they were of no diagnostic value and were not designed to facilitate the treatment of or otherwise benefit the Insureds who were subjected to them; (b) the billing codes submitted to State Farm for the CPT Tests materially misrepresent the nature of the tests purportedly performed on the Insureds; and (c) the documents submitted by the defendants in support of the charges for the CPT Tests are false and misleading in several material respects. In fact, the sole purpose for which the CPT Tests were ordered, performed and interpreted was to financially enrich the defendants. The chart attached hereto as Ex. A summarizes the fraudulent charges identified to date which have been submitted to State Farm.

4.     The defendants' scheme began as early as December 1998 and has continued uninterrupted since that time. As a result of their scheme, State Farm has incurred damages of more than $2,500,000.

II.   **ALLEGATIONS COMMON TO ALL COUNTS**

   A.   **Claims For Payment Under The No-Fault Laws**

   5.      Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

   6.      No-Fault Benefits include up to $50,000 per Insured for necessary expenses incurred for various health care goods and services, including medically necessary diagnostic tests.

   7.      Insureds can assign their right to No-Fault Benefits to providers of medically necessary diagnostic tests.  Pursuant to such assignments, providers may submit claims directly to insurance companies and receive payment for these tests.

   B.   **The Defendants' Roles In The Scheme**

   8.      The Prescribing Doctors treat Insureds at several clinics ("the Clinics") which cater to high volumes of fully ambulatory Insureds who uniformly receive a laundry list of professional services and diagnostic tests, including CPT Tests.  The Prescribing Doctors order the CPT Tests for the Insureds, and sign or authorize their signature stamp to be applied to boilerplate letters of medical necessity, falsely representing that the tests are medically necessary and have diagnostic value.  The Prescribing Doctors know that the CPT Tests are not medically necessary and are of no diagnostic value, but sign or authorize their signature stamps to be used on the boilerplate letters of medical necessity to enable Dr. Tuncel and the PC Defendants to collect No-Fault Benefits for performing and interpreting the tests.

3

9.     The PC Defendants then submit to State Farm charges for Dr. Tuncel's performance and interpretation of the CPT Tests. In support of their charges, Dr. Tuncel and the PC Defendants submit to State Farm boilerplate: (a) letters of medical necessity from the Prescribing Doctors, (b) examination reports bearing Dr. Tuncel's signature stamp which almost invariably conclude that the Insureds have abnormal neurological conditions, and (c) bills which include charges of either $1,620 or $1,916.46 for the performance and interpretation of the CPT Tests rendered to each Insured.

10.     As set forth below, the documents created and used by the defendants are fraudulent in several material respects. The defendants have knowingly submitted or caused these documents to be submitted to State Farm in order to induce State Farm to pay No-Fault Benefits for medically unnecessary CPT Tests which were not compensable under the No-Fault Laws.

### C.     The Medically Unnecessary CPT Tests Upon Which The Scheme Is Premised

#### 1.     The Human Nervous System

11.     The human nervous system is composed of the brain, spinal cord and peripheral nerves which extend throughout the body including the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

4

12.    Peripheral nerves consist of both sensory and motor nerves. They travel throughout the body, and extend from the hands and feet through the arms and legs and into the spinal cord. The peripheral nerves come together at various specific points along the spine before traveling up the spinal cord to the brain. The segments of nerve closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

### 2.    Three Generally Accepted Tests For Diagnosing The Existence, Nature, Extent and Specific Location of Abnormal Conditions In The Peripheral Nerves and Nerve Roots

13.    There are three primary diagnostic tests which are well established in the medical, neurological and radiological communities for diagnosing the existence, nature, extent and specific location of abnormalities (i.e. neuropathies) in the peripheral nerves and nerve roots. These diagnostic tests are called Nerve Conduction Velocity tests ("NCVs"), Electromyography tests ("EMGs") and Magnetic Resonance Imaging tests ("MRIs").

14.    NCVs are non-invasive tests in which peripheral nerves in the hands, feet, arms and legs are stimulated with electrical currents. The velocity, amplitude and shape of the response are then recorded by electrodes attached to the surface of the skin, and are compared with well defined normal responses to identify the existence, nature, extent and specific location of any abnormalities in the peripheral nerves.

15.    NCVs are used to evaluate both sensory and motor nerves, which is often necessary following an auto accident because many nerves have both sensory and motor nerve fibers and it is often difficult to distinguish whether damage has occurred to the sensory nerves, motor nerves, or both.

16.     EMGs involve the insertion of a needle into various muscles to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well defined norms to identify the existence, nature, extent and specific location of any abnormalities in peripheral nerves and nerve roots.  EMGs are used to evaluate motor nerves and motor nerve roots, but not sensory nerves or sensory nerve roots.

17.     Except in very limited circumstances, for diagnostic purposes, NCVs and EMGs should be performed together if nerve damage is suspected following an auto accident, the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique and the tests are necessary to determine an appropriate treatment plan.  If NCVs and EMGs are necessary to diagnose nerve damage, they should be performed at least 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

18.     MRI is an imaging technique which can produce high quality images of the muscle, bone, tissue and nerves inside the human body.  MRIs are often used following auto accidents to diagnose abnormalities in the peripheral nerves and nerve roots through images of the nerves, nerve roots and surrounding areas.

19.     Virtually every Insured who was subjected by the defendants to the CPT Tests described below also received at about the same time all three of the above described diagnostic tests—NCVs, EMGs and MRIs—from other providers who submitted charges of thousands of dollars to State Farm for these tests.  The chart attached hereto as Ex. A identifies each instance where Insureds received NCVs, EMGs and/or MRIs in addition to CPT Tests.  Even if the CPT Tests had diagnostic value for these Insureds, which they do not, there is absolutely no legitimate medical reason why CPT Tests would have been necessary under these circumstances.

### 3.   The CPT Tests Purport To Diagnose Abnormal Conditions In The Sensory Nerves

20.     The defendants' scheme is premised on the submission of charges to State Farm and other insurance companies for the performance and interpretation of CPT Tests on Insureds for the purported purpose of diagnosing the existence, nature, extent and location of abnormalities in their sensory nerves or nerve roots as a result of auto accidents.  As discussed below, the defendants know that the CPT Tests cannot reliably accomplish any such purpose. Furthermore, even if the CPT Tests could provide some reliable diagnostic information, the defendants know that any such information would be worthless where, as here, the Insureds also have been or will be subjected to MRIs as well as NCVs and EMGs which provide diagnostic information that, by any measure, is far more specific, sensitive and reliable.

21.     CPT Tests are non-invasive tests that purport to diagnose abnormalities only in the sensory nerves and sensory nerve roots.  They do not and cannot provide any diagnostic information regarding the motor nerves and motor nerve roots.

22.     CPT Tests are performed by administering electrical current through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and face.  The intensity of the electrical current is increased until the patient states that he perceives a sensation from the stimulus caused by the current.  "Findings" are then made by comparing the minimum intensity of electrical current required for the patient to announce that he perceives some sensation from it (this minimum intensity is referred to as the patient's "current perception threshold") with purported normal ranges.  If the patient's "current perception threshold" is greater than the purported normal range of intensity required to evoke a sensation, it allegedly indicates that the patient has a *hypo*esthetic condition (i.e. the sensory nerves have decreased function).  If the intensity of the electrical current required for the patient to announce that he perceives a

7

sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a *hyper*esthetic condition (i.e. the sensory nerves are in a hypersensitive state).

23.    The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers.  The CPT Tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current.  Specifically, the use of electrical currents with frequencies of 5Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

24.    Moreover, the CPT Tests allegedly can diagnose abnormalities in the sensory nerves sooner than 14-21 days following an accident, which is sooner than NCVs and EMGs can be used to effectively diagnose nerve damage following an accident.

### 4.    Each Manufacturer Of CPT Test Devices Claims The Other Is A Fraud

25.    There are two primary, if not exclusive, manufacturers ("the Manufacturers") of the equipment used to perform CPT Tests.  Neurotron, Inc. makes a device called the Neurometer to perform CPT Tests, and Neuro Diagnostic Associates makes a device called the Medi DX 7000 to perform CPT Tests.

26.    Each Manufacturer claims that its respective protocols and technology are substantially different from the other's in that: (a) the intensity of the electrical current produced by the Neurometer is constant regardless of the unique levels of resistance that each patient might present (i.e., height, weight, physiological features, thickness, texture, temperature of skin, etc.), while the intensity of the electrical current produced by the Medi DX 7000 fluctuates for each patient depending on their unique levels of resistance; (b) the shape of the wave forms of

the electrical current produced by the Neurometer are sinusoidal, while the shape of the wave forms of the electrical current produced by the Medi DX 7000 are asymmetrical; (c) the purported "normal ranges" against which the results of the Neurometer are compared to diagnose abnormalities are static and allegedly based upon studies performed by its inventor, while the "normal ranges" against which the results of the Medi DX 7000 are compared to diagnose abnormalities allegedly are determined by averaging each patient's own current perception threshold results and making certain other unique adjustments that vary by patient; and (d) the suggested protocols for stimulating the nerves vary in several respects.

27.     Regardless of the differences in their protocols and technology, the Neurometer and Medi DX 7000 both purport to measure and diagnose abnormalities based upon current perception thresholds and they share the same flaws which are described below.  In fact, Neuro Diagnostic Associates claims that the Neurometer does not produce valid data or results, and Neurotron makes the same claim regarding the Medi DX 7000.  See Exs. B1 and B2 for each Manufacturer's challenge to the validity of the other.

28.     Among the charges made by Neuro Diagnostic Associates (the manufacturer of the Medi DX 7000) are that: (a) "the Neurometer is a rather poor copy of devices from the 1920s . . .," (b) the Neurometer's technology is not reliable because it does not compensate for the skin's fluctuating resistance (e.g., texture, thickness, temperature of the skin, etc.), (c) many of the studies advanced by Neurotron in support of the validity of the Neurometer were authored by the inventor and are neither practical nor relevant, (d) Neurotron's patents for the Neurometer were fraudulent because the inventor did not disclose in the patent application that aspects of its technology had been in use since the 1930s, and (e) any effort by Neurotron to compare the efficacy of the electrical wave forms (sinusoidal wave forms) used by the Neurometer with the

efficacy of the electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 "is a joke."

29.     Among the charges made by Neurotron, Inc. (the manufacturer of the Neurometer) are that: (a) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber, (b) the alternating output of electrical current used by the Medi DX 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin, etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi DX 7000, (c) the Medi DX 7000 protocols are "incapable of measuring the [current perception] thresholds in the sensory nerves," and (d) there are no peer-reviewed studies that validate the tests performed by the Medi DX 7000.

30.     On information and belief, Dr. Tuncel and the PC Defendants at different times have used the Neurometer and Medi DX 7000 devices to perform all of the Tests at issue. Regardless of which device they used at any particular time, however, the CPT Tests were of no diagnostic value and were not designed to facilitate the treatment of or otherwise benefit the Insureds who were subjected to them.  Therefore, Dr. Tuncel and the PC Defendants have never had any right to demand or receive No-Fault Benefits for any of the CPT Tests they allegedly performed and interpreted.

### 5.     Limitations And The Lack Of Reliable Evidence To Prove The Validity Of CPT Tests

31.     The validity of CPT Tests to diagnose the existence, nature, severity or specific location of any abnormalities in the sensory nerves or any of the nerve fibers of which they are comprised remains unproven.  In fact, (a) there is no reliable evidence to prove that the different

10

frequencies of electrical current used by the Neurometer and Medi DX 7000 can stimulate and reliably test any or all of the three different kinds of sensory nerve fibers, (b) there is no reliable evidence to prove that valid normal ranges of intensity required to evoke a sensation exist to compare with the unique results from an individual's CPT Tests to arrive at a legitimate finding using the Medi DX 7000 and incomplete evidence for valid normal ranges for the Neurometer, (c) even if valid normal ranges of intensity required to evoke a sensation existed for either the Neurometer or Medi DX 7000, there is no reliable evidence to prove that a current perception threshold greater than the normal range would indicate a *hypo*esthetic condition or that current perception threshold less than the normal range would indicate a *hyper*esthetic condition, and (d) even if an abnormal current perception threshold indicated either a *hypo*esthetic or *hyper*esthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from the CPT Tests performed with either the Neurometer of Medi DX 7000. (Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage which can cause *hyper*esthesia and *hypo*esthesia.)

32.   Furthermore, even if CPT Tests could produce any valid diagnostic information regarding any or all of the sensory nerve fibers: (a) there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient, (b) there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots, (c) there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways, (d) the CPT Tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident,

11

and (e) there would be no diagnostic advantage to using the CPT Tests to obtain information regarding the sensory nerve fibers where, as here, patients were also subjected at about the same time to NCVs, EMGs and MRIs which are well established in the medical, neurological and radiological communities for diagnosing the existence, nature, severity and specific location of any abnormalities in both the sensory and motor nerves as well as the nerve roots.

33.     In response to a request from Neurotron, Inc. (the manufacturer of the Neurometer), the Centers for Medicare and Medicaid Services ("Medicare") reviewed the efficacy of CPT Tests performed with the Neurometer and issued a national coverage determination concluding that CPT Tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and are therefore not compensable.

34.     In response to a request from Neurotron, the American Association of Electrodiagnostic Medicine ("AAEM") also reviewed the efficacy of CPT Tests performed with the Neurometer. Like Medicare, the AAEM concluded that there is no reliable evidence: (a) to prove any of the supposed normal ranges of current perception threshold against which a patient's CPT Test results can be measured to arrive at a legitimate finding of normal or abnormal, (b) to find the existence of hypoesthetic or hypoeresthetic conditions based upon allegedly abnormal CPT Test results, (c) to measure the severity of any such condition based upon the degree of abnormality, (d) to identify the cause of any such condition, or (e) to identify the specific location of any such condition.

35.     Consistent with the conclusion that there is no reliable evidence to support the validity of CPT Tests, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of procedure codes ("CPT Codes") for

physicians to use in describing their services for billing purposes, does not recognize a CPT Code for CPT Tests.

### 6. Even If CPT Tests Could Produce Valid Diagnostic Information, Dr. Tuncel And The PC Defendants Do Not Follow The Necessary Protocols Established By The Manufacturers

36.     While the necessary protocols established by the Manufacturers for the effective use of their respective CPT Tests devices vary in some respects, they both require the use of all three frequencies (5 Hz, 250 Hz and 2000 Hz) of electrical current to be used at each skin site to test each of the three types of sensory nerve fibers.  According to the Manufacturers, this is necessary to identify the existence, nature, severity and specific location of any abnormal condition in any or all of the sensory nerve fibers.  Yet, Dr. Tuncel and the PC Defendants use only one frequency (250 Hz) of electrical current which, even according to the Manufacturers, at best can identify some general abnormality in only one type of sensory nerve fiber (A-delta).

37.     The Manufacturers both contend that CPT Tests can diagnose abnormalities in the sensory nerves within the first 14–21 days after a traumatic event such as an auto accident, while other forms of diagnostic tests such as NCVs and EMGs cannot diagnose abnormalities in the sensory or motor nerves until at least 14-21 days after such an event.  Therefore, the Manufacturers conclude that CPT Tests allow for earlier intervention and offer a diagnostic advantage over NCVs and EMGs.  This contention of the Manufacturers is not true because there is no reliable evidence to prove the validity of the CPT Tests in such circumstances.

38.     Even if the CPT Tests could diagnose abnormalities in the sensory nerves within 14-21 days following an auto accident, however, Dr. Tuncel and the PC Defendants virtually always performed the CPT Tests on the Insureds at least 30 days after their respective auto accidents.  The chart attached hereto as Ex. A identifies the claims in which more than 30 days

passed between each Insured's auto accident and the performance of the CPT Tests at issue. Moreover, the CPT Tests were often performed at about the same time that the Insureds were also being subjected to EMGs, NCVs and MRIs.  Under these circumstances, the CPT Tests could not possibly have provided any diagnostic information of any value beyond that which either was or could have been produced through NCVs, EMGs and/or MRIs.

**C.**   **The Defendants' Fraudulent Submissions To State Farm**

39.   To support the fraudulent charges, Dr. Tuncel and the PC Defendants consistently submit to State Farm boilerplate: (a) letters of medical necessity from doctors, including the Prescribing Doctors, (b) examination reports with purported findings by Dr. Tuncel, and (c) statutorily prescribed claim forms for No-Fault Benefits.  While the content of these boilerplate forms have changed slightly over time, they are all false and misleading in several material respects, examples of which are set forth below.

**1.**   **Boilerplate Letters of Medical Necessity**

40.   The boilerplate letters of medical necessity ("Necessity Letters") are signed by or bear the signature stamp of a doctor, including the Prescribing Doctors, and falsely state that CPT Tests are medically necessary for the Insureds.  Copies of representative Necessity Letters are attached hereto as Exs. C1-C4.  The Necessity Letters are false and misleading in several respects.

41.   The Necessity Letters state that the Insureds have been referred for CPT Tests "to detect and quantify the presence of any neuropathies [i.e., abnormal conditions in the nerves] or radiculopathies [i.e., pinched nerve roots]. . . and will allow for early targeted intervention before morbidity can jeopardize outcome." See Ex. C1 attached hereto.  As discussed above, the CPT Tests cannot provide reliable information to detect, quantify or localize neuropathies or

14

radiculopathies, and therefore cannot allow for early targeted intervention before morbidity can jeopardize outcome. Furthermore, the defendants virtually always performed the CPT Tests well after EMGs, NCVs and MRIs were or easily could have been performed to allow for far superior targeted intervention.

42.     The Necessity Letters state that "Since sensory nerves are more vulnerable to injury than motor nerves, I have referred [the Insured] for CPT testing which can detect and isolate nerve dysfunction . . . early on; before chronic nerve degeneration or pathology sets in . . . (This test provides nerve-root specific information in order to direct treatment to the isolated areas of suspected vertebral unit dysfunction)." See Ex. C2 attached hereto. This is false and misleading because: (a) sensory nerves are not more vulnerable to injury than motor nerves, (b) CPT Tests cannot provide reliable information to detect or isolate nerve dysfunction early on, let alone before chronic nerve degeneration or pathology sets in after an accident, and (c) the CPT Tests cannot provide reliable nerve-root specific information of any kind, let alone sufficiently specific information to direct treatment to isolated areas of suspected vertebral unit dysfunction.

43.     The Necessity Letters state that "If this test does reveal nerve impairment, further standard testing (NCV and/or EMG) will be ordered . . ." See Exs. C2 and C3 attached hereto. This is false and misleading because many of the Insureds who were subjected to the CPT Tests had already received NCV and EMG tests.

44.     The Necessity Letters state that the CPT Test "quantifies the functional integrity of both the large and small afferent (sensory) nerve fibers." See Exs. C3 and C4 attached hereto. This is false and misleading because there is no reliable evidence to prove that CPT Tests can quantify the functional integrity of any nerve fiber.

45.     The Necessity Letters state that "The distribution of graded values permits the differentiation between sensory nerve impairment resulting from radiculopathic (spinal nerve root irritation) or compressive etiologies, as well as focal mononeuropthy of a traumatic etiology." See Exs. C3 and C4 attached hereto. This is false and misleading because: (a) there is no reliable evidence to prove the existence of valid "graded values" from CPT Tests, and (b) even if valid "graded values" did exist, there is no reliable evidence to prove that such graded values would permit differentiation between sensory nerve impairments resulting from any of the various causes identified in the quoted sentence.

### 2.     Boilerplate Examination Reports

46.     Dr. Tuncel and the PC Defendants also consistently submit to State Farm a boilerplate Examination Report ("Report") with the signature stamp of Dr. Tuncel. Copies of representative Reports are attached hereto as Exs. D1-D5. Dr. Tuncel and the PC Defendants also purportedly provide the Reports to the Prescribing Doctors and other doctors who order the CPT Tests in connection with their treatment of the Insureds. The Reports are false and misleading in several respects.

47.     The "Technology and Analtic (sic) Protocol" section of the Reports states that "It has been well established that sensory nerves are more vulnerable to injury than motor nerves and the CPT test detects subtle changes to sensory function which are altered weeks, months and in some cases even years before the development of motor nerve degeneration, which EMG requires to detect pathology." See Exs. D1-D3 attached hereto. This statement is false and misleading because: (a) there is no valid basis and it certainly is not "well established" that sensory nerves are more vulnerable to injury than motor nerves, (b) the CPT Tests cannot

16

reliably detect subtle or any other changes to sensory nerve function, and (c) EMGs do not require motor nerve degeneration to detect pathology.

48.     The "Technology and Analtic (sic) Protocol" section of the Reports states "the CPT [Test] uses specific frequencies to assess a broad spectrum of sensory function in the pre and postganglionic fibers." See Exs. D1-D3 attached hereto. This is false and misleading because there is no reliable evidence to prove that the specific frequencies of electrical current which are available for use with the CPT Tests are capable of assessing any function in any particular type of sensory nerve fiber.

49.     The "Technology and Analtic (sic) Protocol" section of the Reports states that "Conventional EMG is limited mainly to the more traumatically resistant large postganglionic motor fibers." See Exs. D1-D3 attached hereto. This is false and misleading because there are no postganglionic motor nerve fibers.

50.     The "Technology and Analtic (sic) Protocol" section of the Reports states that "[o]ne of the many advantages of the CPT test is that it allows for early targeted intervention before morbidity can jeopardize outcome." See Exs. D1-D3 attached hereto. Even if this were true, which it is not, Dr. Tuncel and the PC Defendants virtually always perform CPT Tests on Insureds at least 30 days after their respective auto accidents have occurred, a point at which EMGs, NCVs and/or MRIs either have or could be performed.

51.     The "Technology and Analtic (sic) Protocol" section of the Reports states that "Federal Medicare guidelines list the [CPT Test] as 'reasonable and necessary' in a wide variety of sensory conditions ranging from diabetic polyneuropathies and peripheral entrapment neuropathies to neck and back pain (radiculopathies)." See Exs. D1-D3 attached hereto. This is false and misleading in that Medicare never listed CPT Tests as reasonable and necessary in a

wide variety of sensory conditions or any of those enumerated in the Report. In fact, Medicare's only specific determination regarding CPT Tests was the national coverage determination described in paragraph 33 above which concluded that the CPT Tests were not reasonable and necessary to diagnose sensory neuropathies (abnormal conditions in the sensory nerves).

52.     The "SE-CPT Analytic Protocol" section of the Reports represent that "[t]he analytic protocol used here is the most conservative classification system..." (See Exs. D1 and D2 attached hereto) but never describes the protocol that was actually used to perform or interpret the CPT Tests. Nor does it explain why any such protocol represents the "most conservative classification system." Moreover, the protocol used by Dr. Tuncel and the PC Defendants is, inexplicably, substantially different than the ones published by the Manufacturers of the Neurometer and Medi DX 7000.

53.     The "SE-CPT Analytic Protocol" section of the Reports states that "Measurements are rated above (hypoesthesia) and below (hyperesthesia) the mean population range of current perception threshold, after adjusting the overall patterns to correct for individual idiosyncrasies (reducing false positive tests)." See Exs. D1 and D2 attached hereto. This is false and misleading because: (a) there is no reliable evidence to prove the existence of a valid "mean population range of current perception threshold" against which any results of a CPT Test could be reliably measured, (b) there is no reliable evidence to prove that valid adjustments can be made to CPT Test results "to correct for individual idiosyncrasies" and reduce false positive results, (c) valid findings of hypoesthesia or hyperesthesia cannot be made based upon CPT Test results, and (d) even if such a finding could be made from CPT results, no reliable conclusion can be made regarding the cause of any such condition.

18

54.     The "Technology" section of the Reports states that "CPT has a sensitivity in the 80% to 90% range with a specificity of 100% that allows precise system threshold responses within 0.1 mA. With this greater accuracy, the CPT tests are now, more than ever, the method of choice for early detection of sensory neuropathies, radiculopathies, Reflex Sympathetic Dystrophy (RSD) and for screening patients before more painful and invasive tests are performed." See Ex D5. This is false and misleading because: (a) there is no reliable evidence to prove that CPT Tests have sufficient sensitivity or specificity to allow precise system threshold responses, let alone that they have sensitivity in the 80% to 90% range, or a specificity of 100%, and (b) CPT Tests have never been generally accepted, let alone the "method of choice," in the medical, radiological or neurological communities for early detection of sensory neuropathies, radiculopathies, RSD, or early screening for these conditions.

55.     The "Hypoesthesia" section of the Reports states that "Hypoesthesia is the most serious dysfunction," then sets forth a grading scale to determine the severity of any such condition based upon the extent to which a patient's current perception threshold varies either from purported normal ranges or from one side of the patient's body to the other. See Exs. D1-D4 attached hereto. This is false and misleading because: (a) the CPT Tests cannot reliably diagnose hypoesthesia, (b) hypoesthesia is not "the most serious dysfunction" of the sensory nerves, indeed it is no more serious than hyperesthesia or many other conditions, (c) there is no reliable evidence to prove the validity of the enumerated grading scale based on deviations from normal ranges because there are no valid normal ranges and there is no validity to the severity scores based upon the levels of deviation from any such ranges, and (d) there is no reliable evidence to prove the validity of the enumerated grading scale based on deviations in the current perception thresholds from one side of a patient's body to the other.

19

56.     The "Hyperesthesia" section of the Reports states that a finding of hyperesthesia is made if a patient's current perception threshold deviates by a certain level from the "adjusted mean pattern." See Exs. D1-D4 attached hereto. This is false and misleading because: (a) the CPT Tests cannot reliably diagnose hyperesthesia, and (b) there is no reliable evidence to prove the existence of a hyperesthetic condition if a patient's test results deviate by a certain level from the "adjusted mean pattern" because there is no valid "adjusted mean pattern" and, even if there were, there is no validity to the statement that the specified deviation from that "pattern" represents a hyperesthetic condition.

57.     The "Assymetry (sic)/Deviation" section of the Reports suggests that deviation of more than 20% between a patient's current perception threshold in nerve roots at the same level on either side of the spine is "significant" and "clinically relevant." See Exs. D1-D3 attached hereto. This is false and misleading because: (a) CPT Tests cannot reliably measure or localize current perception threshold in any specific nerve root, and (b) there is no reliable evidence to prove the representation that the enumerated deviation in the current perception threshold between nerve roots at the same level on either side of a patient's side is "significant" or "clinically relevant."

58.     The "Type A-delta fiber Deviation Index" section of the Reports sets forth a grading scale to determine the severity of hypoesthetic and hyperesthetic conditions based upon deviations from the "population average mean." See Ex. D1 attached hereto. This is false and misleading because: (a) the CPT Tests cannot reliably diagnose hypoesthesia or hyperesthesia, and (b) there is no reliable evidence to prove the validity of the enumerated grading scale based on deviations from a "population average mean" because there is no valid "population average

20

mean" and there is no validity to the severity scores based upon the levels of deviation from any such mean.

59.     The "Internucial Dysinhibition and Pain Tolerance Threshold (PTT)" section of the Reports purports to describe conditions under which false hyperesthetic findings may appear in certain patients who have chronic hypoesthesia. See Exs. D1-D4 attached hereto. This is false and misleading because there is no reliable evidence to prove a single representation made therein.

60.     The "General Considerations" section of the Reports states that "Published studies report over 95% sensitivity making [CPT Tests] more useful than EMG/NCV, which require quite advanced nerve degeneration before detecting morbidity." See Exs. D1 and D2 attached hereto. This is false and misleading because: (a) there is no valid published study which reports any such thing, (b) CPT Tests are not more useful than EMGs and/or NCVs under any circumstances, and (c) EMGs and NCVs do not require "quite advanced" nerve degeneration before detecting morbidity.

61.     The "Findings Summary" section of the Reports sets forth Dr. Tuncel's purported findings of hypoesthesia or hyperesthesia. See Exs. D1-D5 attached hereto. Dr. Tuncel has found that virtually every Insured had some degree of hypoesthetic condition and, in rare instances, found that some Insureds had a hyperesthetic condition. He then invariably concludes that these conditions are consistent with a diagnosis of radiculopathy or related sensory nerve dysfunction.

62.     Dr. Tuncel's invariable conclusion that his findings are consistent with a diagnosis of radiculopathy or related sensory nerve dysfunction for virtually every Insured is false and misleading for the simple reason that CPT Tests cannot reliably confirm or exclude the

existence or location of a radiculopathy or related sensory nerve dysfunction. Therefore, Insureds are wrongfully led to believe that they have radiculopathies or related sensory nerve dysfunction when, in fact, there is no valid basis for making any such finding based upon the results of the CPT Tests.

### 3.   Boilerplate Claim Forms (i.e., NF-3 Forms)

63.   In addition to the fraudulent Necessity Letters and Reports, Dr. Tuncel and the PC Defendants also submit fraudulent claim forms (i.e., NF-3 Forms) to State Farm to collect their charges for the performance and interpretation of the CPT Tests purportedly rendered to each Insured.

64.   The NF-3 Forms represent that the CPT Tests performed on and interpreted for each Insured were medically necessary. This is false and misleading because the CPT Tests were never medically necessary and were not designed to facilitate the treatment or otherwise benefit the conditions of the Insureds.

65.   The NF-3 Forms always use CPT Code 95904 which represents that the tests for which payments are being sought are NCVs of the sensory nerves This is false and misleading because the defendants never performed or interpreted an NCV.

66.   The NF-3 Forms represent that: (a) no Insured ever had the "same or similar condition," (b) the condition of every Insured was "solely" a result of an automobile accident and never arose from their employment, and (c) Dr. Tuncel could "not determin[e] at this time" whether "the injury will result in significant disfigurement or permanent disability." These representations were designed to enhance the seriousness of the Insureds' conditions, to support the medical necessity of the CPT Tests performed and interpreted by Dr. Tuncel and to induce State Farm to pay No-Fault Benefits for these medically unnecessary tests .

22

67.     Remarkably, none of the documents submitted to State Farm by Dr. Tuncel and the PC Defendants ever made any reference to the NCVs, EMGs and/or MRIs that were performed on any of the Insureds who also were subjected to CPT Tests.

### D.     State Farm's Justifiable Reliance

68.     Dr. Tuncel and the Prescribing Doctors who have attested to the medical necessity of the CPT Tests and the validity of the charges are obligated legally and ethically to act honestly and with integrity.

69.     To induce State Farm to promptly pay the fraudulent charges for CPT Tests, Dr. Tuncel and the PC Defendants have retained law firms which submit all of the above described documents to State Farm with a cover letter indicating that the firms have been hired to represent the PC Defendants in collecting the charges.  Implicit in these law firm submissions is the threat of expensive and time consuming arbitration or litigation if State Farm fails to promptly pay the PC Defendants' charges in full.

70.     State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.  As a result, State Farm has incurred damages of more than $2,500,000 based upon the fraudulent charges.

### E.     Dr. Tuncel's Refusal To Comply With His Legal Obligation To Provide Information To State Farm Regarding The Medical Necessity of The CPT Tests

71.     Based upon the volume of CPT Tests and the improbable patterns and irregularities described above, State Farm requested in writing that Dr. Tuncel comply with his legal obligation under the No-Fault Laws to provide an examination under oath ("EUO") about

the medical necessity of and the appropriateness of the charges for the CPT Tests purportedly performed on Insureds.  Dr. Tuncel and the PC Defendants have refused to provide any such EUO.

### III.   JURISDICTION AND VENUE

72.    Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* ("RICO") because they arise under the laws of the United States.  This Court also has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

73.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

### IV.   PARTIES

74.    State Farm Mutual Automobile Insurance Company ("State Farm") is an Illinois corporation with its principal place of business in Bloomington, Illinois.  State Farm is licensed and engages in the business of insurance in New York.

75.    Defendant Huseyin Tuncel resides in and is a citizen of New York.  Dr. Tuncel is licensed to and practices medicine in New York.

76.    Defendant CPT Medical Services, P.C. is a New York professional service corporation with its principal place of business in New York.  Dr. Tuncel is the owner of CPT Medical Services, P.C., and controls all aspects of its activities.

77.     Defendant Hoss Medical Services, P.C. is a New York professional service corporation with its principal place of business in New York.  Dr. Tuncel is the owner of Hoss Medical Services, P.C., and controls all aspects of its activities.

78.     Defendant Bozena Augustyniak resides in and is a citizen of New York. Augustyniak is licensed by the State of New York to practice medicine.  As reflected in Ex. E, Augustyniak ordered CPT Tests for at least 91 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

79.     Defendant Michael Aziz resides in and is a citizen of New York.  Aziz is licensed by the State of New York to practice medicine.  As reflected in Ex. F, Aziz ordered CPT Tests for at least 53 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

80.     Defendant Anne Brutus resides in and is a citizen of New York.  Brutus is licensed by the State of New York to practice medicine.  As reflected in Ex. G, Brutus ordered CPT Tests for at least 30 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

81.     Defendant Irina Kimyagarova resides in and is a citizen of New York. Kimyagarova is licensed by the State of New York to practice medicine.  As reflected in Ex. H, Kimyagarova ordered CPT Tests for at least 34 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

82.     Defendant Victor Mariani resides in and is a citizen of New York.  Mariani is licensed by the State of New York to practice medicine.  As reflected in Ex. I, Mariani ordered CPT Tests for at least 47 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

83.     Defendant Ahmad Riaz resides in and is a citizen of New York. Riaz is licensed by the State of New York to practice medicine. As reflected in Ex. J, Riaz ordered CPT Tests for at least 37 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

84.     Defendant Mark Slamowitz resides in and is a citizen of New York. Slamowitz is licensed by the State of New York to practice chiropractic. As reflected in Ex. K, Slamowitz ordered CPT Tests for at least 24 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

85.     Defendant Sako Tarakhchyan resides in and is a citizen of New York. Tarakhchyan is licensed by the State of New York to practice chiropractic. As reflected in Ex. L, Tarakhchyan ordered CPT Tests for at least 25 Insureds knowing that the tests were medically unnecessary and of no diagnostic value.

## V.     CAUSES OF ACTION

### First Cause of Action
(Against CPT Medical Services, P.C. and
Hoss Medical Services, P.C. Under 28 U.S.C. § 2201)

86.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 above.

87.     There is an actual case and controversy between State Farm and the PC Defendants, as to all charges for CPT Tests that have not been paid. State Farm contends that the PC Defendants are not entitled to coverage for No-Fault benefits for any of these charges.

88.     In each and every claim submitted to State Farm, the PC Defendants knowingly have made the following material misrepresentations: (a) that the CPT Tests are medically necessary and of diagnostic value when, in fact, they are not, (b) that the tests performed and

26

interpreted were NVCs as described by CPT Code 95904 when, in fact, the tests were CPT Tests which are not within the definition of CPT Code 95904; and (c) that the representations in the Necessity Letters, Reports and NF-3s which are described in paragraphs 39-67 above are true when, in fact, they are not.

89.    Because the PC Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that they have submitted to State Farm, they are not entitled to any coverage for No-Fault Benefits for any of the charges at issue.

90.    Accordingly, State Farm seeks a judgment declaring that the PC Defendants are not entitled to collect No-Fault Benefits for any of the charges for CPT Tests which have not been paid, as well as any other relief the Court deems just and proper.

## Second Cause of Action
### (Against Huseyin Tuncel for Violation of 18 U.S.C. § 1962(c))

91.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 above.

92.    CPT Medical Services, P.C. and Hoss Medical Services, P.C. are an association-in-fact "enterprise" ("the CPT Testing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. Both CPT Medical Services, P.C. and Hoss Medical Services, P.C. were formed by Huseyin Tuncel for the common purpose of facilitating the submission to State Farm and other insurance companies of fraudulent bills for CPT Tests that were not medically necessary. The creation and use of both CPT Medical Services, P.C. and Hoss Medical Services, P.C. to submit those fraudulent bills, reduced the number of bills that otherwise would have had to have been submitted through either

of those entities and reduced the likelihood that State Farm and other insurance companies would identify the volume and pattern of bills coming from Huseyin Tuncel.

93.     Huseyin Tuncel has knowingly conducted and/or participated, directly or indirectly, in the conduct of the CPT Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills for CPT Tests that were not medically necessary. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex. A attached hereto.

94.     State Farm has been injured in its business and property by reason of Dr. Tuncel's above-described conduct in that it has paid more than $2,500,000 based upon the fraudulent charges.

95.     By reason of its injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### Third Cause of Action
#### (Against All Defendants Except CPT Medical Services, P.C. and Hoss Medical Services, P.C. for Violation of 18 U.S.C. § 1962(d))

96.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 and 92 above.

97.     The CPT Testing Enterprise is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

98.     The defendants have wilfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c) that is to conduct and/or participate, directly or indirectly, in the conduct of the

CPT Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills for CPT Tests that were not medically necessary. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex. A attached hereto.

99.     Each defendant knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by facilitating the submission to State Farm and other insurance companies of fraudulent bills for CPT Tests that were not medically necessary and were of no diagnostic value.

100.     State Farm has been injured in its business and property by reason of the defendants' above-described conduct in that it has paid more than $2,500,000 based upon the fraudulent charges.

101.     By reason of its injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### Fourth Cause of Action
### (Against All Defendants for Common Law Fraud)

102.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 85 above.

103.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, thousands of fraudulent bills which included charges for the performance and interpretation of medically unnecessary CPT Tests.

29

104.    The false and fraudulent statements of material fact include (a) the representations in the Necessity Letters, Reports and NF-3s that the CPT Tests are medically necessary when, in fact, they are not, (b) the use of CPT Code 95904 in the bills submitted to State Farm, which represents that the tests performed were NCVs when, in fact, the tests performed were CPT Tests; and (c) the other representations made in the Necessity Letters, Reports and NF-3s which are described in paragraphs 39-67 above.  The date, the nature of the misrepresentations and the identity of the parties who made and caused these misrepresentations to be made in each and every claim are identified in the charts attached hereto as Exs. A and E-L.

105.    The defendants made these false and fraudulent statements to induce State Farm to pay charges for the performance and interpretation of medically unnecessary CPT Tests which were not compensable under the No-Fault Laws.

106.    State Farm justifiably relied on the defendants' false and fraudulent representations, and as a proximate result has incurred damages of more than $2,500,000 based upon the fraudulent charges.

107.    The defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles State Farm to recover punitive damages.

108.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### Fifth Cause of Action
(Against All Defendants for Unjust Enrichment)

109.    State Farm realleges and incorporates by reference, as if set forth fully herein, the allegations in paragraphs 1-85 above.

110.   When State Farm paid CPT Medical Services, P.C. and Hoss Medical Services, P.C., State Farm reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

111.   State Farm's payments constitute a benefit which CPT Medical Services, P.C. and Hoss Medical Services, P.C. voluntarily accepted.

112.   The defendants caused CPT Medical Services, P.C. and Hoss Medical Services, P.C. to wrongfully obtain payments from State Farm through their fraudulent billing scheme.

113.   Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

WHEREFORE, State Farm demands that a Judgment be entered in its favor:

(a)   on its First Cause of Action, declaring that neither CPT Medical Services, P.C. nor Hoss Medical Services, P.C. has any right to receive payment for any pending bills for CPT Tests;

(b)   on its Second Cause of Action against Huseyin Tuncel, for compensatory damages in an amount to be determined at trial, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(c)   on its Third Cause of Action against all defendants except CPT Medical Services, P.C. and Hoss Medical Services, P.C., for compensatory damages in an amount to be determined at trial, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(d)   on its Fourth Cause of Action against all defendants, for compensatory and punitive damages in an amount to be determined at trial plus interest;

(e)     on its Fifth Cause of Action against all defendants, for the return of all monies which the defendants have wrongfully obtained plus interest; and

(f)     awarding State Farm its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Dated: November 1, 2004
       New York, New York

KATTEN MUCHIN ZAVIS ROSENMAN

By: _____
       Ross O. Silverman (RO 4567)
       Jay Shapiro  (JS 2499)
       Michael F. Gallagher (MG 7895)
       Attorneys for Plaintiffs
       575 Madison Avenue
       New York, NY 10022
       (212) 940-8800

                    -and-

       Barry I. Levy
       SHAPIRO, BEILLY, ROSENBERG
        ARONOWITZ, LEVY & FOX, LLP
       225 Broadway – 13th Floor
       New York, NY  10007
       (212) 267-9020

OF COUNSEL:

Jonathan L. Marks, Esq.
KATTEN MUCHIN ZAVIS ROSENMAN
525 West Monroe Street
Suite 1600
Chicago, IL  60661-3693
(312) 902-5200

Doc #:CHI01 (277811-00176) 50185389v4;11/09/2004/Time:14:51